GARCIA, SCHNAYERSON & THOMPSON
ATTORNEYS AT LAW
225 W. Winton Avenue, Suite 208
Hayward CA  94544
Telephone: (510) 887-7445
Facsimile: (510) 887-0646

JESSE J. GARCIA [61223]
Attorney for Defendant
JEREMY DONAGAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>JEREMY DONAGAL,<br><br>　　　　　Defendant. | Case No.: CF-14-0285 JST<br><br><br>**DEFENDANT's<br>SENTENCING<br>MEMORANDUM** |

## **INTRODUCTION**

Mr. Jeremy Donagal submits this sentencing memorandum in support of a sentence at the lowest end of the applicable advisory United States Sentencing Guidelines (USSG) range, in accordance with the terms of his Plea Agreement entered under the Federal Rules of Procedure, Rule 11(c)(1)(C).

Mr. Donagal has entered a plea of guilty to a violation of Title 21 U.S.C. § 841 (a)(1) (the manufacture, distribution and possession with intent to distribute a controlled drug); a violation of 21 U.S.C. § 331(i))(3) (sale of counterfeit drugs), and a violation of 18 U.S.C. § 1956(a)(2)(A)

(international money laundering). The United States Probation Office has prepared a Presentence Report (PSR) and agrees with the parties' assessment in Paragraph 8 of the Plea Agreement that the advisory United States Sentencing Guideline Range (USSG) in this case is at the low end of the guidelines within the range for Total Offense Level 25. As noted in the Plea Agreement at Paragraph 7, however, the parties disagree as to the appropriate Criminal History Category.

Mr. Donagal respectfully requests that the Court depart horizontally from the Advisory Guidelines pursuant to Section 4A1.3 and find that a criminal history category of III significantly over-represents the seriousness of Mr. Donagal's criminal history.  A sentence at the low-end of Total Offense Level 25, Criminal History Category II, or 63 months, would adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and otherwise fully reflect each of the factors embodied in 18 U.S.C § 3553(a).

**ARGUMENT**

**I.**

**The Court Should Depart Horizontally Based on Overstatement of Criminal History**

The defense hereby seeks a horizontal departure by this court of Mr. Donagal's current Criminal History Point Calculation of 4.  A simple one point decrease would mean a different Criminal History Category and a lesser Guideline range.  Moreover, the lower calculation would more accurately reflect the type of criminal history this defendant has.  The defense acknowledges that the pair of prior convictions suffered by the defendant, despite the minimal sentences imposed, leads to a two point calculation.  In addition, under USSG

§4A1.1(d), two more points would be added because Mr. Donagal was on misdemeanor court (unsupervised) probation at the time of his commission of the current offense.  However, putting Mr. Donagal's criminal history in the context of his personal history will provide the court ample grounds for the horizontal departure sought here.

A. Facts

Essentially, the circumstances which brought about the two prior convictions that Mr. Donagal suffered as well as the instant case can be traced back to his diagnosis with critical brain cancer at the age of 26.  Following severe seizures, scans of Mr. Donagal's brain revealed a cancerous brain tumor.  The medications prescribed after his initial biopsy included the strong opiate pain medication, Dilaudid, as well as Percocet.  He quickly became addicted.

After two brain surgeries were performed as well as intensive chemotherapy and radiation, the prescribed pain medication levels increased.  Then, his mother was diagnosed with cancer and died. By this time, he was "off the deep end with the pain medication" and continued to be very addicted for years.  *See* Letter of Jeremy Donagal, attached as Exhibit 1.  Medical records of Jeremy's condition are also available and can be provided to the court if the court deems it necessary at sentencing. They are extensive.

After his mother's death, Mr. Donagal invested his own money into his mother's estate in preparation for its sale. However, a lien was placed on the house, encompassing its entire value and Mr. Donagal was left with nothing.  He nevertheless was able to start over again, dedicating himself to a successful personal training business. He relapsed again, however, and then he entered the world of pill manufacturing and committing the crimes outlined in the PSR.

B. Applicable Law

"If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. § 4A1.3. "There can be no exhaustive list of factors the court should consider in determining whether the seriousness of defendant's criminal history or the likelihood of recidivism is over-represented by his designated category . . . Criminal history departures permit a court to put the defendant's record in the context of his life and background . . . . Every defendant is different and must be considered as an individual." *U.S. v. Hammond*, 240 F.Supp.2d 872, 877 (2003), citations and quotations omitted.

Accordingly, the discretion the district court has under § 4A1.3 is very broad and should be considered "encouraged." *See id.*, quoting *United States v. Wilkerson*, 183 F.Supp.2d 373, 380 (D.Mass.2002) and citing Spencer Freedman, *In Defense of Criminal History Departures*, 13 Fed. Sen. Rptr. 311, 313 (May/June 2011) ("In promulgating § 4A1.3, the Commission established an enormous reservoir of judicial discretion to achieve the purposes of sentencing . . . .").

Mr. Donagal's Criminal History Level is reached primarily from a nearly eight year old controlled substance-related offense, and a single other offense, again controlled-substance related, in 2011. The nearly eight year old conviction involved marijuana for which he received only 36 months probation and 17 days in jail. His second conviction, a midemeanor for

Methalqualone, also resulted in a relatively lenient sentence of 36 months probation and 3 actual days in jail.

The Application Notes of §4A1.3 provides an example of a proper departure for a defendant with two misdemeanor convictions close to ten years prior to the instant offense.  In *U.S. v. Collins*, 122 F.3d 1297, 1307, the Tenth Circuit affirmed a departure based in part on the fact that one of the predicate convictions occurred close to ten years prior to the instant offense, and resulted in a relatively lenient sentence.

Additionally, whether prior offenses were committed while under the influence of drugs or alcohol, or otherwise suffering from the effects of a mental disorder, is a factor this court may consider in granting the requested departure. *See id.* at 878, citing *United States v. Hammond,* 37 F.Supp.2d 204, 205 (E.D.N.Y.1999) (departing from category VI to III where defendant "had no history of violent behavior [and his] prior arrests resulted from minor drug crimes involving facilitation of the sale of drugs and the kind of petty criminality associated with a poor addict's attempt to acquire money for the purchase of narcotics"); *United States v. Garcia*, 497 F.3d 964 (9th Cir. 2007) (Remand was required for defendant's resentencing, since district court erroneously concluded that it did not have the discretion to consider defendant's alleged diminished mental capacity due to drug addiction)

Significantly to the instant case, "if the defendant has taken steps to deal with his substance abuse or mental illness, the court may conclude that counting the offenses committed **while suffering the effects of addiction or illness results in an overstatement of the seriousness of his criminal history or the likelihood that he will repeat his crimes**."

*Hammond, supra,* 240 F.Supp. 2d at 878, emphasis added, citing *United States v. Fletcher,* 15 F.3d 553, 557 (6th Cir.1994) (noting defendant's attempts to deal with his alcohol problems in context of § 4A1.3 departure), *overruled on other grounds as stated in United States v. Jones,* 107 F.3d 1147 (6th Cir.1997).

The misdemeanor probation that Defendant was on at the time of the commission of the offenses in this case was probation to the court with no more than general conditions attached. Defendant was wholly unsupervised on his misdemeanor court probation.  He was not required to meet or even check in by phone with any probation officer.  Neither was he provided any services by the court, probation, or any other agency to address his substance abuse.  Thus, in both of his prior cases, having received no substantial custody sentence to help him reflect on his addiction, nor supervision or services following the jail time, Mr. Donagal was never forced to face his drug demons.

The experience of this case and Mr. Donagal's months of incarceration has caused him to reflect on and realize the extent of his drug addiction problem, as he confesses in detail in his letter to the court.  He has already while in County Jail attended and graduated from the voluntary sixty-day DEUCE program and is committed to achieving lifetime sobriety.  He would like to continue with the RDAP program while in BOP custody. Mr. Donagal has made the decision to cease his substance abuse – and this demonstrated desire for sobriety makes him less likely to repeat his crimes – which, notably are all non-violent crimes, justifying a departure from § 4A1.3.

C. Conclusion

Given the factors laid out above and the personal circumstances surrounding the two prior convictions suffered by Mr. Donagal, the court should horizontally depart from the Guidelines and place Mr. Donagal in a Criminal History Category of II.

## II.
### The Prior Arrests Alleged In PSR Paragraphs 64 and 65 are Not True and Should Not Be Considered by this Court

Paragraph 64 of the Presentence Report alleges a 1997 arrest of Mr. Donagal for "Criminal Conspiracy" by the Concord Police and an eventual dismissal after successful diversion. The defendant was not the Jeremy Donagal who was arrested in that matter and that was discussed between defense counsel and US Probation Officer Specialist Goldberry.

In Paragraph 65 of the Presentence Report, it is alleged that Mr. Donagal was arrested but not charged with marijuana cultivation-related offenses on Spetember 27th, 2011. In fact, the defendant was charged with those offenses. This was the arrest that preceded the conviction in Stanislaus county for the offense alleged to have occurred earlier that year on May 23rd. (See PSR Paragraphs 58 and 65 and Exhibit 2) Thus, US Probation Officer Specialist Goldberry was wrong to add the arrest in the 2011 prior conviction as an "Other Arrest" and also wrong to note that no charges were filed. Therefore, Paragraph 65 is misleading and should not be considered by the court.

While these alleged Other Arrests in Paragraphs 64 and 65 would not add to the defendant's Criminal History Calculation, their inaccuracies must be pointed out. In light of the information provided above, as well as in the PSR and in the defendant's letter, it is unfair to

7

have these criminal events wrongfully attributed to him.  Thus, the court should not be clouded by the substance-less spectre of prior arrest allegations when determining the horizontal departure requested in this memorandum.

### III.
### The Court Should Impose a Sentence of 63 Months, a Sentence that is Sufficient, But Not Greater Than Necessary to Comply With the Purposes of Sentencing Under 18 U.S.C. § 3553(a)

The proper framework for federal sentencing is the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to achieve the goals of sentencing." *Kimbrough*, 128 S. Ct. at 570.  A sentence of 63 months serves the purpose of sentencing – it would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense while at the same time affording adequate deterrence to criminal conduct and protect the crime from any further crimes of the defendant.  *See* 18 U.S.C. § 3553.

### A.  The History and Characteristics of the Defendant and Nature and Circumstances of the Offense Warrant a Sentence of 63 Months

Mr. Donagal's history and characteristics support a 63 month sentence, which is a bottom-of-the-guidelines sentence if this court grants a horizontal departure to Criminal History Category II. Mr. Donagal's journey to his current situation is outlined in Part I above and will not be repeated here. It is a story of one who has had much to overcome, including a battle with brain cancer that left him terribly addicted to opiates.

Despite his crimes and addictions, he has managed to be a good and loving father for his three children and two stepchildren not only by providing for them financially, but by being

extremely involved in their lives, nurturing them, playing with them, and being a true father in every respect of the word. Letters from his family indicate that he has been a significant positive force in his family. (*See* Ex. 2, Character Letters).

To his credit, his family had no idea that he was involved in any criminal activity. Having suffered from living with his own stepfather who was addicted to methamphetamine, he was not raising his children to believe that any criminal behavior was acceptable or wise. Despite his own struggles, he has tried to show his children a joyful and peaceful life.

His pill addiction combined with his commendable desire to ensure those he loves are not wanting have been his downfall, as they appear to be his primary motivation for his crimes. His goal was not to bring himself riches, but to help those for whom he felt financially responsible and to enable him to continue with his expensive pill addiction while avoiding withdrawals. While the road he chose was obviously the legally and morally wrong path to follow, his intentions were not grounded in selfish greed. The business, however, was all too successful and he allowed it to quickly grow out of hand.

In accordance with his personality, Mr. Donagal has accepted full responsibility and has made no attempt to minimize his culpability. He has expressed deep remorse (not just for being caught, but for his actions) to the undersigned counsel and to his family. His prior criminal history, beyond a DUI as a juvenile, were related to his pill addiction and to the events comprising the events for which he is being punished in the instant case. He has never been incarcerated for any significant amount of time, and is determined to beat his addiction and use his time in federal prison to get well

and better himself.  As a sober man, Mr. Donagal has the ability to remake himself into a productive and welcomed member of society

**B. A 63-Month Sentence Would Achieve the Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation.**

Section 3553(a)(2)(A) requires the Court to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Section 3553 further requires the Court to consider whether the proposed sentence would "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C). Finally, the Court is instructed to craft a sentence that will "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(D).

A 63-month sentence achieves these goals. Mr. Donagal is in need of continued drug education and therapy. He would receive this with the prison's RDAP program. In addition, a 63-month sentence provides ample time for Mr. Donagal, with continued resolve, to remain sober for long enough to achieve lifelong sobriety.

The sentence is long enough that it would deter him from future crimes and protect the public, as was likely contemplated by the United States Sentencing Commission when crafting the applicable guidelines.

Finally, a 63- month sentence would be sufficient to serve the goals of deterrence and punishment, while still allowing Mr. Donagal – who is only thirty-six years old with a wife and five

young children – a chance at rehabilitation and an opportunity to contribute to society and to ensure the stability and success of the next generation for which he is responsible.

## CONCLUSION

In sum, it is urged that the Court find that a  a sentence of 63 months (Total Offense Level 25, Criminal History Category II) would adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and otherwise fully reflect each of the factors embodied in 18 U.S.C § 3553(a).  Such a sentence would take into account the gravity of Mr. Donagals conduct and would amount to the most serious sentence that he has ever received.

WHEREFORE, Mr. Donagal prays that this Honorable Court grant his motion for downward departure and recommend he be admitted to the RDAP program.

Dated this 21st day of September, 2015.

Respectfully submitted,
GARCIA, SCHNAYERSON & THOMPSON
ATTORNEYS AT LAW


/s/ *Jesse J. Garcia*

JESSE J. GARCIA
Attorney for
JEREMY DONAGAL

11

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2015, I electronically transmitted the attached document to the Clerk of Court using the ECF system for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to AUSA Kevin James Barry and all counsel of record.


_/s/ Jesse J. Garcia_
JESSE J. GARCIA

# EXHIBIT "1"

Your Honor:

Although I have no excuse for my previous offenses, I would like to explain in detail what happened during that period of time in my life. And also what lead to these crimes.

My mother was the majority owner, and I was part owner of Bensons Radiator Service in Walnut Creek, California. I had been a part of that business since 1998 from the age of 18. After sometime working there, and through the help of my mother, I bought my first house in Pleasant Hill, California. This happened around 2003 to 2004, as I was around 23 to 24 years old. I sold this house a year of two later, and bought a house in Lafayette, California. My mother was a home owner in Walnut Creek, California. My mother was also the owner of the property that Bensons Radiator operated on. Business was doing well, and my mother and I decided to purchase a 10 acre property in Vacaville, California. The idea was to grow truffles on this land, as well as have a place for the kids to go when they grew up. It was maybe six months after this time that my life would change for the worse.

As I woke one morning to use the bathroom I apparently had a seizure. Upon becoming aware of what happened, my first wife convinced me to get a check up at the hospital. I took her advice, and when we arrived, I was told I need a MRI. A short while later we had the results. The doctor looked at me and said I'm sorry but I have bad news, "you either had a small stroke or it's a tumor." "There is no way we can tell unless we operate." Nevertheless I made the decision to have the brain surgery. I underwent the biopsy, and as I woke I was in extreme pain. The doctor gave me Dilaudid which is a strong opiate pain medication. When I was sent home I was given Percocet. Soon I would become addicted to these pills. After some research the doctor confirmed I had brain cancer. He said not to worry at the moment, and advised me to wait a year to see if it grows. About six months after the diagnosis I had a bad feeling, and made the decision to go to UCSF for a second opinion. I took another MRI, and when the results came back my cancer had grown to a stage 3 or 4. The doctor explained the seriousness of the situation. He said, "If you had waited six more months, there is a good chance you could have died. I need to operated right-a-way.

For the last six months my mother had been financially supporting the Lafayette house, the Vacaville house, and her Walnut Creek home. Now I needed to go in for a second brain surgery that would no doubt put me out of commission for at least another six months. Unfortunately I had no choice but to go in for the surgery to have the tumor removed. After it was removed, and when I woke I was once again in a lot of pain.

The doctor gave me higher doses of pain medication, as the lower doses no longer worked because of my high tolerance. The doctor set up a plan which consisted of 14 months of chemotherapy and six months of radiation. All this time my mother continued supporting the entire family. About mid way through my chemotherapy treatment, my mother started to bleed through her nose. When she went to the hospital to get a cat scan she got her results. She was told she had small cell cancer and had maybe a year to live. She immediately began chemotherapy and radiation a long with me. Within six months the cancer took over her body, and she was no longer able to work. I was desperate to save everything my mother and I worked for. I then made a very bad decision to allow marijuana to be grown on the Vacaville property. A decision I would have never made if it were not for the circumstance. Soon after, I was arrested for this crime. My mother was still alive but at the end of her life. The Vacaville house was taken, and I sold my Lafayette house as I could no longer afford it. I moved to my first wife's dad's house and sold the radiator shop. I put all the profits into my mother's house so she would not have a house payment. My mother lived a little while longer then passed away. By this time I had finished my chemotherapy and radiation.

I went off the deep end with the pain medication due to my grief over my mother's death. I lost control of my life, and as the person in charge of my mother's estate, I now had the responsibility to prepare my mother's funeral, and sell her property. I made the decision to put the remaining profit from my Lafayette house into my mother's house to prepare it for sale. The profit was to be split between my brother, sister and I. Minus the 225k I put up to fix the home. The house was in escrow for 1.5 million. Fifteen days before escrow was to close, a 3 million dollar lien was put on my mother's house stopping the sale. At some point my mother was sued and lost because she didn't show up for court during the time she was battling her cancer. I spoke with attorneys and they all thought we could win. But there was nothing I could do, as all my remaining money was

in my mothers home. Needless to say I lost everything.  First my mother, then her home, then our business, and my home.

This was a low point in my life.  My pain medication use was the highest it had ever been.  I continued like this for a few years.  My first wife's dad was helping to support our family at the time.  But soon he was no longer able to afford it, and I realized that my family and I would be homeless.  So I checked myself into a methadone clinic and got myself sober.  At this point I started my personal training business, and after a while we were doing okay.  I cannot explain why but at some point I relapsed.  I convinced myself that I could use the pain medications just once in a while, but I proved myself wrong.  I started to use everyday sometime after my first wife and I separated and before we divorced.  I was no longer able to support my kids or myself as a result of my pain medication addiction.

To avoid withdrawals from my addiction, and in an effort to support my family, I committed my second crime in Modesto.  I was arrested, bailed, and once again got myself sober.  I focused hard on health, fitness, and my personal training business.  After a few years I was able to buy my current home in Martinez.  I married my second wife and inherited my two step children.  Sometime after I bought my house and before I married I relapsed for the third time.  My personal training business made enough to support my family.  But with my addiction it soon became more then I could bare financially, and I committed my third and current offense.

This is the first time I have been jailed for any length of time, and I have had a lot of time to think about what I have done.  I realize I need help for my problem and I cannot do it on my own.  Sitting back now and looking at things with a clear mind I realize being incarcerated may have saved my life.  For I was surely on a path and a mission to join my mother.  This last year of being incarcerated is the longest period of time I have been sober in 10 years.  Looking back, I feel a lot of remorse and regret.  I would like for you to know that my thoughts are not of criminal behavior.  But when I become addicted to pain medication something comes over me.  I'm willing to do almost anything to avoid withdrawal.  Even if it means going against everything I believe in. Being incarcerated for the last year is the first time I have really been able to sit back and analyze my decision with a clear mind.  Its difficult for me to see the pain I have

put my family through, and I will have to live with that burden. But I also now realize that my incarceration was a necessary way to force me into rehabilitation and realize what I have done. I have learned one very important lesson through this experience, opiates is something I cannot take in moderation. In fact, I cannot take these pills under any circumstance as this is the root cause for my crimes. I am an adult and cannot take pills again. I can never put my family or myself through this experience again. I want to be the person I was before I got brain cancer, a positive and productive member of society. I want to be someone my kids can look up too, and not ashamed of. I know it will take some time to redeem myself to my family and to society, but I have no doubt that I will. For I have a plan for when I'm incarcerated, and for when I'm released from confinement. I'm committed to sobriety, and I will never touch a pain pill again.

I feel a great remorse for the crimes I committed. I acted with both selfishness and disregard for the law. My behavior was shameful and unacceptable. Being sober while incarcerated for the last year has hit me hard. It has made me realize some of the people and things I have taken for granted. I was blessed with a loving and devoted wife, five beautiful children, a supportive father, ex-wife, a profitable personal training business, and a home. I have let down all of the people I love most. Because of my actions, I have lost everything I ever worked for and as a result my wife and kids will soon be without a home. No words can describe the sorrow I feel, for I have failed my family. I feel both shame and guilt for the burden I have put upon the court, government, agencies, and the tax payers of the United States. Sometimes I wish I could go back in time to change all that I have done wrong. And even though the past is something I cannot change, the future is something I can. This is my first time being incarcerated and it will be my last. I now understand my addiction to opiates was the root cause for my actions, and what started as a means to support my habit, quickly got out of hand. I plan on using my time incarcerated as a positive step forward in my rehabilitation. In County Jail, I attended and graduated from the voluntary sixty day DUCE drug program.. In DUCE, I learned that the best of life is only achieved through a sober one.

With a clear mind I can begin to enjoy the truly important things in life. Things like watching my kids grow. And one day having kids of their own. I realize that it is up to me by leading through example to put my kids on the correct path, so they too can live a positive and prosperous life. To achieve this, my only

option is sobriety.

Your honor, with the courts approval I have the following request.  I would like to continue my drug treatment in the RDAP program.  My understanding is it's an intense program which I believe could further my progress for treatment.  I would like to stay as close as possible to my family at a facility that offers RDAP.

My plan, when I'm released from prison is to begin personal training.  This will help my family and I get some stability in our lives again.  I plan to return to school and finish my AA degree and attend the following business courses: marketing, human resources, and accounting.  With school completed and some money saved from personal training, I plan to open a nutrition store that also caters to diet plans.  I have no doubt that by using my time in a positive manner such as school, work, and continuing my rehabilitation through drug treatment.  I will once again be the productive and law abiding citizen I once was.

Your honor, sometime before my mother passed away, she confronted me with some words of advise, some insight I should have considered long ago.  She said, "Son, a smart man will learn from his own mistakes and a wise man will learn from the mistakes of others."  Now there is no doubt in my mind that I have learned from my own mistakes.  Next to my mother's passing, this last year has been the most difficult time for my family and I.  Being a burden to my family subsequent to imprisonment is something I cannot, and will not allow.  So through this experience, and from this moment forward, I have made a commitment to myself; a commitment to not only be a smart man, but through lessons and life experience to develop, transform, and transcend to a wise man.

Respectfully,


Jeremy Donagal

# EXHIBIT "2"



STANISLAUS COUNTY SUPERIOR COURT
STATE OF CALIFORNIA

THE PEOPLE OF THE STATE OF CALIFORNIA,    )
)
vs.    )
)
JEREMY RAYMOND DONAGAL    )
(DOB: 10/18/78)    )
(AT LARGE)    )
PETER CONRAD KROMSCHRODER    )
(DOB: 8/2/79)    )
(AT LARGE)    )
DEFENDANT(S)    )
No. 1436932    )
)

**FILED**

11 SEP 26 PM 1:55

CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS

BY _____ DEPUTY

# COMPLAINT -- CRIMINAL
DEU N1141M

State of California    )
County of Stanislaus ) ss.

On September 26, 2011, F. LANDEROS, STANISLAUS DRUG ENFORCEMENT AGENCY, complains and alleges, upon information and belief, that said defendant(s) did commit the following crime(s) in the County of Stanislaus, State of California.

**COUNT I:** On or about May 23, 2011, defendant(s) did commit a felony, POSSESSION OF A CONTROLLED SUBSTANCE FOR SALE, violation of <u>Section 11378 of the California Health and Safety Code</u>, in that the defendant(s) did willfully, unlawfully, and feloniously have in their possession for purpose of sale a controlled substance, to wit, **testosterone.** must 11377(b) steroids

**COUNT II:** On or about May 23, 2011, defendant(s) did commit a felony, POSSESSION OF A CONTROLLED SUBSTANCE FOR SALE, violation of <u>Section 11378 of the California Health and Safety Code</u>, in that the defendant(s) did willfully, unlawfully, and feloniously have in their possession for purpose of sale a controlled substance, to wit, **stanozolol.**

**COUNT III:** On or about May 23, 2011, defendant(s) did commit a felony, CULTIVATING MARIJUANA, violation of <u>Section 11358 of the California Health and Safety Code</u>, in that the defendant(s) did willfully, unlawfully, and feloniously plant, cultivate, harvest, dry, and process marijuana. 11359(c) M?

**COUNT IV:** On or about May 23, 2011, defendant(s) did commit a felony, POSSESSION OF MARIJUANA FOR SALE, violation of <u>Section 11359 of the California Health and Safety Code</u>, in that the defendant(s) did willfully, unlawfully, and feloniously have marijuana in their possession for purpose of sale.

**COUNT V:** On or about May 23, 2011, defendant(s) did commit a felony, THEFT OF SERVICES, violation of <u>Section 498(d) of the California Penal Code</u>, in that the defendant(s) did willfully, unlawfully, feloniously, and with intent to deprive any utility of any part of the full lawful charge for utility services it provides did any or all of the following 1. divert utility services, 2. prevent a meter or other device from accurately performing its measuring function, 3. tamper with property owned or used by a utility to provide utility services, 4. made or cause to be made a connection with properties owned and used by the utility, and 5. use or receive utility services knowing that such use was without consent of the utility, and did obtain utility services greater than Four Hundred Dollars ($400.00).
///

<u>**COUNT VI**</u>:   On or about May 23, 2011, defendant(s) did commit a felony, REMOVE/INJURE TELEPHONE APPARATUS, violation of <u>Section 591 of the California Penal Code</u>, in that the defendant(s) did willfully, unlawfully, feloniously, and maliciously take down, remove, injure, obstruct and sever any line of a telephone, telephone apparatus or part thereof.

<u>**COUNT VII**</u>:   On or about May 23, 2011, defendant(s) did commit a felony, GRAND THEFT, violation of <u>Section 487(a) of the California Penal Code</u>, in that the defendant(s) did willfully, unlawfully and feloniously take the property of another of a value exceeding nine hundred and fifty dollars ($950.00).

*11366.5(a) lesser to Ct I, as a misd*

*a person who manages, keeps ...*
*bldg for purposes of mfg, sale ...*
*controlled sub.*

JML/rcs

All of which is contrary to law in such cases made and provided, and against the peace and dignity of the People of the State of California.

Said Complaint therefore prays that a warrant be issued for the arrest of said defendant(s) and that said defendant(s) be dealt with according to law.

I certify under penalty of perjury, at Modesto, California, that the foregoing is true and correct.

Dated: _9.26.2011_                              _____ 5246

                                                         Complainant